**THIS OPINION IS A
PRECEDENT OF THE TTAB**

Mailed:
August 6, 2013

**UNITED STATES PATENT AND TRADEMARK OFFICE**

_____

**Trademark Trial and Appeal Board**

_____

AS Holdings, Inc.

v.

H & C Milcor, Inc., f/k/a Aquatico of Texas, Inc.

_____

Opposition No. 91182064
to application Serial No. 76461157

_____

Terence J. Linn, Esq. of Gardner Linn Burkhart & Flory LLP for
AS Holdings, Inc.

Dillis V. Allen, Esq. for H & C Milcor, Inc., f/k/a Aquatico of
Texas, Inc.

_____

Before Quinn, Taylor, and Wellington, Administrative Trademark
Judges.

Opinion by Wellington, Administrative Trademark Judge:

Applicant, H & C Milcor, Inc. (hereinafter "applicant"), is

the owner of an application to register a product configuration

mark on the Principal Register for goods identified, as amended,

as "non-metal building materials, namely, pipe flashing for use

in sealing openings for pipes" in International Class 19.[1]   We

hereinafter refer to the mark as the "pipe boot design."

As originally filed, the mark in the application drawing

page appeared as follows:



During prosecution of the application, the following

amended drawing was filed and was accepted by the examining

attorney:



In conjunction with the filing of the amended drawing page,

the following figure representing a close-up view of a section

---

[1] Serial No. 76461157, filed on October 18, 2002, under Section 1(a) based on a claimed date of first use anywhere and in commerce on April 30, 1982. Portal Plus, Inc. filed the application and, on June 16, 2005, an assignment to applicant was recorded with the Office (reel/frame nos. 3106/0669).

of the configuration mark, with reference numbers, was also

filed, along with a description of the mark:



The description of the mark currently reads as follows:

> The mark consists of a plurality of frusto-conical steps arranged with the largest diameter step at the bottom and the smallest diameter step at the top as shown above in Fig. 1. Each of the steps, as shown in Fig. 3 above, consists of: (1) a lower frusto-conical surface 10; (b) a circular ring 11 with a semi-circular cross section in a vertical plane; (c) a short annular nearly vertical frusto-conical surface 12; (d) a flat horizontal annular surface 13, and; (e) a frusto-conical surface 14 extending upwardly from the inner reach of surface 13. Applicant makes no claims to the shape of the boot portions in dotted lines.[2]

Applicant claimed in the application that the mark has

acquired distinctiveness under Trademark Act Section 2(f), 15

U.S.C. § 1052(f).

AS Holdings, Inc.[3] (hereinafter "opposer") has opposed

registration of the proposed pipe boot design mark on the

grounds that the mark is functional, has not acquired

---

[2] The description of the mark was accepted by the examining attorney, even though it included the numbers used in the applicant's close-up view of the design that were meant as points of reference only. These numbers are not a feature of the amended drawing.

[3] The notice of opposition was filed by Alpha Systems, Inc. on January 22, 2008; on May 15, 2008, opposer changed its name to AS Holdings, Inc.

distinctiveness, and that applicant's amendment to its mark constitutes an impermissible material alteration to the mark as originally filed.  Specifically, opposer pleaded that the pipe boot design is "a functional configuration of the goods that is not distinctive, has not acquired secondary meaning or acquired distinctiveness, and does not operate as a trademark" (Opposition, para. 70); the applied-for mark is "a configuration of a design feature that is functional and serves a utilitarian purpose or purposes" (*id.*, para. 74); and that the original drawing has been "materially altered" (*id.*, para. 78-79).[4]

Applicant, in its answer, made several admissions regarding the prosecution of the application as well as admissions concerning its, or its predecessor-in-interest's, marketing of goods with the pipe boot configuration.  Applicant otherwise denied the salient allegations that its pipe boot configuration is functional, lacks distinctiveness, and that the amendments made to the original drawing were improper.[5]

---

[4] Opposer also asserted a fraud ground. Not. of Opp., para. 88.  However, opposer did not pursue this claim in its trial briefs, and therefore we consider this claim to be waived.

[5] Applicant also asserted a number of affirmative defenses, namely, that opposer failed to state a claim upon which relief could be granted (para. 89), that the Board lacks subject matter jurisdiction or personal jurisdiction over the applicant (para. 96-97), that opposer lacks standing (para. 98), that opposer's claims are barred by the doctrines of waiver, estoppel, and/or laches (para. 101), and that opposer is an "intermeddler and comes to this Board with unclean hands" (para. 102).  These defenses were not pursued at trial or argued in applicant's trial brief, and therefore we consider these defenses to be waived.

<u>The Record</u>

By rule, the record includes the involved application file. Trademark Rule 2.122(b), 37 C.F.R. 2.122(b). Of particular relevance to this proceeding, the application includes applicant's evidence in support of its claim of acquired distinctiveness submitted during the prosecution of the application. *Cold War Museum, Inc. v. Cold War Air Museum, Inc.*, 586 F.3d 1352, 1357-58 (Fed. Cir. 2009). The pleadings are also automatically of record. The parties have also agreed that "either party may use any and all discovery depositions" as testimonial depositions.[6]

During its testimony period, opposer submitted the testimony of Sean Steimle, Vice President of Operations of the Commercial Products Group, and General Manager, of Hart & Cooley; Christopher C. Kintzele, Chief Financial Officer of AS Holdings, Inc.; and Michael J. Hubbard, Senior Development Chemist at Alpha Systems. Opposer also filed a notice of reliance on the following materials comprising exhibits from one or more of the aforementioned depositions:[7]

---

[6] Opposer filed a consented motion to such effect on June 19, 2009, which is hereby granted. Trademark Rule 2.127.

[7] We note that several of these listed exhibits are not materials that may be properly introduced by notice of reliance alone. However, because they were introduced through the testimony depositions, they are properly of record. The exhibits included in the notices of reliance have been numbered using the following format "ALP00###". When an exhibit is cited, we will use these page numbers. When a patent is cited, the following format will be used to indicate the specific column and row within the patent: "ALP00###, Col. #,

1.  Portals Plus product catalog;

2.  Technical product information for the Portals Plus "Medium Pipe Boot" (two copies, with one containing hand-drawn additions), "pipe flashings," and "adapter rings" taken from http://www.portalsplus.com;

3.  An advertisement of the Commercial Products Group of Hart & Cooley, Inc.;

4.  Installation instructions for applicant's pipe boot taken from http://www.portalsplus.com;

5.  Various webpages from http://www.milcorinc.com, http://www.rpscurbs.com, http://www.portalsplus.com, and http://www.genflex.com;

6.  A listing of goods taken from the Portals Plus website under the title "Product Selection";

7.  A copy of the applicant's amended drawing and mark description;

8.  U.S. Patent No. 4,211,423 ("Roof Seal Device") (expired) and various other patents, including patents specifically naming Michael J. Hubbard as an inventor;

9.  "Installation instructions for pipe boots" by Portals Plus, Inc.;

10. A hand-drawn sketch made by applicant's attorney of a hypothetical pipe boot design, and a second sketch showing hand-drawn additions made by opposer's attorney;

11. Photographs of various pipe boots; and

12. Technical information sheets for Firestone pipe flashing.

Applicant has submitted the testimony of David V. Smith, Jr., President and Chairman of the Board of AS Holdings, Inc.;

---

line(s) ##-##". Moreover, the exhibits are labeled as either "Opposer's" or "Applicant's" exhibits, and since there are overlapping exhibit numbers, when we cite to a specific exhibit, we will note to which we are referring (i.e., "Opposer's" or "Applicant's").

David V. Smith, III, Sales for AS Holdings, Inc.; Joseph W. Merryman, Chemist in New Product Development for Alpha Systems; Sean Steimle;[8] and Larry Devitt, Marketing Manager for the Commercial Products Group of Hart & Cooley.

## Applicant's Request for Review of Interlocutory Order

Applicant requests in its brief that the Board "revise" its order of December 20, 2010, wherein certain exhibits, namely, 16, 20, and 21, submitted by applicant were stricken from the record, either in whole or in part, as was the testimony corresponding to these exhibits. Brief, p. 46. Applicant sought reconsideration of this order on January 24, 2011, and said request was denied by the Board.

TBMP Section 518 (3d ed. rev. 2 2013) explains that "at final hearing, the Board panel to which the case is assigned for decision may review an interlocutory ruling and reverse it, if appropriate." In this matter, we see no basis for reversing the Board attorney's previous decision. Accordingly, the relevant exhibits with corresponding testimony remain stricken from the record. Any arguments applicant made in its brief that rely on these exhibits or the related testimony have not been considered.

---

[8] This second deposition of Mr. Steimle, taken on November 12, 2009, is hereinafter cited as "Steimle Dep. (II) [page]:[line(s)]," in order to distinguish it from the first Steimle deposition (taken on October 3, 2008, transcript filed by opposer).

7

Standing

Opposer must prove its standing as a threshold matter in order to be heard on its substantive claims. *See, e.g.*, *Lipton Indus., Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 213 USPQ 185 (C.C.P.A. 1982). To do so, opposer must meet the liberal threshold for proving standing as discussed by the Court of Appeals for the Federal Circuit, namely, whether an opposer's belief in damage has a "reasonable" basis in fact and reflects a "real interest" in the case. *See Ritchie v. Simpson*, 170 F.3d 1092, 50 USPQ2d 1023 (Fed. Cir. 1999); *see also Jewelers Vigilance Committee Inc. v. Ullenberg Corp.*, 853 F.2d 888, 7 USPQ2d 1628 (Fed. Cir. 1988).

Opposer has demonstrated that it is in the commercial roofing product business, including the manufacture of pipe boots similar to those depicted in the drawing page of the subject application. Specifically, David Smith, Jr., testified that opposer manufactures pipe boots sold under the name "Alpha Systems," and has made these goods for a third party.[9] He states that these are the type of goods that opposer will sell as part of its commercial roofing business,[10] and that opposer has "been asked by several companies to make pipe boots for them."[11]

---

[9] Smith, Jr., Dep. 13:17-20.

[10] *Id*. at 27:4-6.

[11] *Id*. at 27:24-25.

Based on the above and the entire record, it is clear that opposer is not a mere intermeddler and has established a reasonable basis for its belief in damage resulting from applicant's registration of the proposed mark, and therefore has a real interest in this case. *See Ritchie v. Simpson*, *supra*; *see also* TBMP §309.03(b) and the authorities cited therein. Accordingly, opposer has standing to bring the opposition proceeding.

We now address the grounds for opposition.

<u>Amendment to Application</u>

We turn first to opposer's contention that the amendment by applicant to the original drawing, during the prosecution of this application, represents a material alteration of the original drawing. Such allegations do not constitute a valid ground for opposition. The Federal Circuit, the Board's principal reviewing court, has determined that a "valid ground" for denying registration must be a "statutory ground which negates the appellant's right to the subject registration." *Young v. AGB Corp.*, 152 F.3d 1377, 1380, 47 USPQ2d 1752 (Fed. Cir. 1998) (quoting *Lipton Indus., Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 1026, 213 USPQ 185, 187 (CCPA 1982)). Determinations by the examining attorney with regard to examination requirements, such as the acceptability of the identification of goods or services, or of the drawing do not

constitute statutory grounds for refusal of registration; thus, any alleged error by the examining attorney in this regard cannot form the basis of an *inter partes* challenge to the registrability of the mark. *Saint-Gobain Abrasives, Inc. v. Unova Indus. Automation Sys., Inc.*, 66 USPQ2d 1355 (TTAB 2003) ("It would be manifestly unfair to penalize defendant for non-compliance with a requirement that was never made by the Examining Attorney.").

Accordingly, we give no further consideration to opposer's allegations regarding any impropriety of the amendment to the drawing.

As we now turn our attention to the functionality and distinctiveness grounds, we do so in the context of the mark as last amended and shown in the drawing page ultimately accepted by the examining attorney.

## Functionality

A product is functional, and cannot serve as a trademark, if it is essential to the use or purpose of the article or if it affects the cost or quality of the article. *Qualitex Co. v. Jacobson Prods. Co., Inc.*, 514 U.S. 159, 34 USPQ2d 1161, 1163-1164 (1995) (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 214 USPQ 1, 4 n.10 (1982)). Functional matter cannot receive trademark protection.

At its core, the functionality doctrine serves as a balance between trademark and patent law. As the Supreme Court explained in *Qualitex*:

> The functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature. It is the province of patent law, not trademark law, to encourage invention by granting inventors a monopoly over new product designs or functions for a limited time, 35 U.S.C. §§154, 173, after which competitors are free to use the innovation. If a product's functional features could be used as trademarks, however, a monopoly over such features could be obtained without regard to whether they qualify as patents and could be extended forever (because trademarks may be renewed in perpetuity).

34 USPQ2d at 1163.

In making our determination as to whether a proposed mark is functional, the following four factors are considered:

> (1) the existence of a utility patent that discloses the utilitarian advantages of the design sought to be registered;

> (2) advertising by the applicant that touts the utilitarian advantages of the design;

> (3) facts pertaining to the availability of alternative designs; and

> (4) facts pertaining to whether the design results from a comparatively simple or inexpensive method of manufacture.

*In re Becton, Dickinson and Co.*, 675 F.3d 1368, 102 USPQ2d 1372, 1377 (Fed. Cir. 2012) (citing *In re Morton-Norwich Prods., Inc.*, 671 F.2d 1332, 213 USPQ 9, 15-16 (CCPA 1982)). Upon consideration of these factors, our determination of

11

functionality is ultimately a question of fact, and depends on the totality of the evidence presented in each particular case. *Valu Eng'g, Inc. v. Rexnord Corp.*, 278 F.3d 1268, 61 USPQ2d 1422, 1424 (Fed. Cir. 2002); *In re Caterpillar Inc.*, 43 USPQ2d 1335, 1339 (TTAB 1997). Furthermore, it is not required that all four factors be proven in every case, nor do all four factors have to weigh in favor of functionality to support a refusal; nevertheless, in reaching our decision, we will review all four factors. *See Valu Eng'g, Inc. v. Rexnord Corp.*, 278 F.3d at 1276, 61 USPQ2d at 1427; *In re Udor U.S.A. Inc.*, 89 USPQ2d 1978, 1979 (TTAB 2009).

Regarding the first factor, a utility patent claiming the design features at issue is strong evidence that those features are functional. *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 29-30, 58 USPQ2d 1001, 1005 (2001); *In re Becton, Dickinson & Co.*, 675 F.3d at 1375, 102 USPQ2d at 1377. Portals Plus, Inc. (the original applicant for this application) owned the now-expired U.S. Patent No. 4,211,423 (hereinafter "patent '423") for a pipe boot that appears in the patent drawing as follows:[12]

---

[12] Applicant notes on page 18 of its trial brief that this is a configuration for a "stepped pipe boot."



Patent '423 contains the following claim with respect to the goods:

> 6.  In a device as defined in claim 4 for use with a cylindrical object, said split boot having a plurality of annular step portions in vertically spaced planes and tubular portions of progressively smaller diameters joining the inner edge of each step portion and the outer edge of the next higher step portion, said boot being severable along the top edge of a selected tubular portion having a diameter matching that of said object.[13]

In the "Summary of the Invention" for patent '423, the severable, stepped design is described as the "most preferabl[e]" configuration for this device.[14]  Patent '423 describes the purpose of the stepped configuration as allowing for the accommodation of "pipes or other cylindrical objects of

---

[13] Opposer's Notice of Reliance, Opposer's Exhibit 12, p. ALP00215, Col. 8, lines 51-58 (claim 6).

[14] *Id*. at p. ALP00212, Col. 2, line 2.

various larger sizes."[15] Mr. Steimle explained in his testimony that the pipe boot is a cone shape designed to fit 1" to 6" pipe and could be cut, at the appropriate step, to fit the size of the pipe at issue.[16] In other words, the steps are designed to "fit particular pipe sizes."[17]

A number of third-party utility patents have also been submitted to show that the stepped design of the pipe boot configuration is functional. A third-party utility patent may be relevant evidence of functionality when it discloses the utilitarian advantages of the applied-for product configuration sought to be registered. *See, e.g.*, *Kistner Concrete Prods. Inc. v. Contech Arch Techs., Inc.*, 97 USPQ2d 1912, 1921 n.7 (TTAB 2011); *In re Dietrich*, 91 USPQ2d 1622, 1627 (TTAB 2009). Of the third-party patents of record, the following further demonstrate that the stepped configuration feature of applicant's pipe boot design is functional:

> U.S. Patent No. 3,807,110 (claiming a severable, stepped configuration of a pipe boot);[18] and
>
> U.S. Patent Nos. 5,826,919 and 5,988,698 (claiming a stepped configuration of a pipe penetration fitting

---

[15] *Id.* at p. ALP00212, Col. 2, lines 3-4.

[16] Steimle Dep. (I) 20:2-7, 30:9-15.

[17] *Id.* at 32:1-7.

[18] Opposer's Notice of Reliance, Applicant's Exhibit 13, p. ALP00284, Col. 6, lines 10-18 (claims 3 & 4)

"for receiving a plurality of different sizes of pipes".[19]

The walls of the steps of applicant's pipe boot design are tapered, or "frusto-conical" as applicant refers to them. As Mr. Steimle testified, this feature allows for the pipe boots to cover a range of pipe diameters falling within the different steps.[20] In other words, the pipe boots are stepped at standard diameter sizes, but they will still accommodate pipes with diameters falling within those steps. The conical shape further allows the user to cut the pipe boot to a size smaller than the size of the pipe so that the pipe boot securely seals around the pipe as the pipe boot is fitted onto the pipe.[21] This is a functional feature disclosed in U.S. Patent No. 5,176,408 for a weather seal device having tapered walls similar to those in the applied-for design.[22] In that patent, it is noted that the upper end of the cone is open and "of a diameter to require enlargement thereof by stretching it to fit a particular sized elongate member. As a result of the stretching, the sleeve

---

[19] *Id*. at p. ALP00246, Col. 8, lines 54-56 (claim 3), p. ALP00231, Col. 8, lines 54-56 (claim 3).

[20] Steimle Dep. (I) 51:20-24. *See also* Devitt Dep. 33:20-24, 37:10-22.

[21] Steimle Dep. (I) 20:2-7.

[22] *See also* U.S. Patent No. 4,664,390 (Opposer's Notice of Reliance, Applicant's Exhibit 13, p. ALP00252, Col. 7, lines 15-18 (claim 9, claiming tapered walls of a weather seal device)).

15

establishes a sealing contact with the elongate member."[23] Consequently, the tapered, or "frusto-conical," walls of the applied-for design are also functional.

We turn our consideration now to the remaining features of the applied-for design, which consist of a circular rib near the top or beginning of each step in applicant's pipe boot design followed by a short, nearly vertical surface. Both Mr. Steimle and Mr. Devitt testified that the rib acts as a cutting guide, allowing the user to better cut the vertical wall between the rib and the horizontal ledge of the next step.[24] Mr. Hubbard also testified that the rib prevents clamps from sliding off the pipe boot.[25] These functional features are disclosed in third-party patents. *See*:

> U.S. Patent No. 4,664,390: "Spaced along the tapered portion 18 are a plurality of external ridges 14 denoting where the sleeve may be cut off to suit elongate members of different diameters.";[26]

> U.S. Patent No. 5,176,408: "Spaced along the tapered portion 18 are a plurality of external circumferential ridges 14 denoting where the sleeve may be cut off to suit larger elongate members of different diameters.";[27]

---

[23] Opposer's Notice of Reliance, Applicant's Exhibit 13, p. ALP00260, Col. 5, lines 32-36.

[24] Steimle Dep. (I) 33:6-39:5, 67:16-68:3; Devitt Dep. 14:6-10, 36:1-9.

[25] Hubbard Dep. 29:12-16. *See also* Kintzele Dep. 46:7-15 ("I think this [rib] acts as a cap to keep the clamp from sliding up.").

[26] Opposer's Notice of Reliance, Applicant's Exhibit 13, p. ALP00250, Col. 4, lines 32-36.

[27] *Id*. at ALP00260, Col. 5, lines 37-42.

> U.S. Patent Nos. 5,826,919 and 5,988,698: "A plurality of circumferential beads 52 running around the sleeve above each hose clamp help to keep the hose clamps in place at their respective points along the sleeve. The beads are also useful in that they can be used as guides for trimming from the boot any portion of the sleeve that will not be used. For example, if the boot is used to seal a large diameter pipeline, the portion of the sleeve above the bead at the first hose clamp can be trimmed such as with a utility knife."[28]

Thus, the circular rib near the top of each step in the pipe boot and the short, nearly vertical surface above it are also functional.

In sum, the utility patent evidence, including applicant's own, now-expired patent, discloses the utilitarian advantages of applicant's pipe boot design. The severable, stepped configuration allows the pipe boot to accommodate pipes of various diameters, and the tapered walls within each step provide a closer fit for the pipe diameters that fall between the standard sizes (set forth or by way of the stepped decrease in diameter sizes). That is, a secure seal is attained by placing the boot over the pipe. As to the circular rib near the top of each step, there is a small, nearly vertical wall above said rib that acts as a cutting guide and as a barrier to keep clamps in place.

Regarding the second *Morton-Norwich* factor, the record includes applicant's catalog touting several of the

---

[28] *Id*. at ALP00245, Col. 5, lines 7-15, ALP00230, Col. 5, lines 7-15.

17

aforementioned utilitarian features of applicant's pipe design. Specifically, the catalog explains that "[t]he conically shaped steps of the Portals Plus pipe flashing will securely seal all pipes and the large double thick molded rib at the top of each step offers supreme tear resistance and reinforcement as well as a cutting guide."[29] This description corroborates Mr. Steimle's testimony that the conical shape (within each step) allows the pipe boot to work with a variety of different diameter pipes[30] and that the rib "allow[s] the product not to tear easily" and is "[u]sed as a guide for cutting."[31] Mr. Devitt concurred to the extent that "[s]omeone could make that argument that it [the rib] is reinforcing and obviously we do in our marketing literature."[32] Further, on page 19 of its brief, applicant concedes that "[i]t is true that Portals Plus brochures beginning about 1996 attribute a cutting guide and reinforcing function to the rib …, and later materials a clamp stopping function to ribs."[33] As this evidence demonstrates, there are utilitarian advantages of applicant's pipe boot design as a whole, namely, conically-shaped steps that provide a secure pipe

---

[29] Opposer's Notice of Reliance, Opposer's Exhibit 9, p. ALP00473.

[30] Steimle Dep. (I) 30:23-31:15.

[31] *Id.* at 33:6-39:5.

[32] Devitt Dep. 18:13-15.

[33] Applicant goes on to note that "some [competitors] have adopted rings for reinforcement." Brief at p. 21.

seal for various size pipes, and a rib that acts as a cutting guide when separating the different steps and that also provides resistance to tears when cutting the steps. Applicant's own advertising extols specific utilitarian advantages of the applied-for product design and is strong evidence that the matter sought to be registered is functional. *See, e.g.*, *In re Becton, Dickinson & Co.*, 675 F.3d at 1375-76, 102 USPQ2d at 1377-78; *Kistner Concrete Prods., Inc.*, 97 USPQ2d at 1924.

As to the third and fourth *Morton-Norwich* factors, the evidence of alternative designs that can perform the same functions as applicant's design is somewhat limited. There are competitors' pipe boots with stepped walls that are not tapered or "frusto-conical"; however, these designs would not perform the same function as applicant's design, namely, allowing the pipe boot to fit a range of pipe diameters falling between the standard pipe sizes at each step. Moreover, Mr. Hubbard testified that using vertical instead of tapered walls for each step makes it more difficult to pull the boot down over the pipe, as there is "too much surface-area in contact."[34]

Another possible alternative design would be a pipe boot that is a cone without the steps. However, that design would result in a cone that is "extremely tall without the steps to

---

[34] Hubbard Dep. 128:15-25.

bring it in."[35]  The cone would need to be tall in order to maintain an angle deep enough so that the boot, when clamped to the pipe, would sit flush and prevent gathering at the clamp that would be produced by a cone with shallower walls, which could result in leaks.[36]

There is disagreement between the parties as to the simplicity of manufacturing this particular pipe boot design or whether applicant's method of manufacture is relatively inexpensive.  Mr. Steimle testified that the applied-for design "would require more material and be a cost to the manufacturer."[37]  Mr. Hubbard testified that the benefit of using curved ribs, as applicant does with its design, is that it is "easier for molding purposes to get out of the mold,"[38] and Mr. Smith, Jr., agreed;[39] Mr. Devitt disagreed with this statement.[40]  However, even if applicant's design is more expensive or more difficult to make, that does not establish that the configuration is not functional.  *In re Dietrich*, 91 USPQ2d 1622, 1637 (TTAB 2009) ("[E]ven at a higher manufacturing cost, applicant would have a competitive advantage for what is

---

[35] *Id*. at 128:4-6.

[36] *Id*. at 132:10-20, 133:17-134:5.

[37] Steimle Dep. (I) 83:7-12.

[38] Hubbard Dep. 130:14-15.

[39] Smith, Jr., Dep. 39:7-8.

[40] Devitt Dep. 20:21-22.

essentially … a superior quality wheel."); *In re Pingel Enter. Inc.*, 46 USPQ2d 1811, 1821 (TTAB 1998) ("That applicant, despite the inherent advantages of a design which is simple and less expensive to manufacture than other petcocks, has, however, deliberately chosen a more complex and expensive manner in which to manufacture its product does not mean that the configuration thereof is not de jure functional."); *see In re Am. Nat'l Can Co.*, 41 USPQ2d 1841, 1844-45 (TTAB 1997).

Ultimately, based on all of the record evidence and arguments in relation to the *Morton-Norwich* factors, we find that the overall design of applicant's proposed pipe boot configuration mark is dictated by utilitarian concerns. Thus, we find that the pipe boot configuration mark as a whole is functional and is not registrable on that basis.

## Acquired Distinctiveness

Having determined that the applied-for mark is functional, it is incapable of registration on either the Principal or Supplemental Register. Opposer has argued that, in the alternative, even if the applied-for mark is not functional, the mark should also be refused registration because it has not acquired distinctiveness.[41] For sake of completeness, we address the alternative claim.

---

[41] Applicant argues in its brief that the acquired distinctiveness issue raised by opposer is a new issue and that opposer "never notified Applicant of its intent to pursue acquired distinctiveness alone without

The applied-for mark consists of a design of a product. Product design almost invariably serves purposes other than source identification, and consumers are aware that even the most unusual product design is intended not to identify the source of the goods, but to render the product itself more useful or appealing. *See Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 213, 54 USPQ2d 1065, 1069 (2000); *In re Slokevage*, 441 F.3d 957, 962, 78 USPQ2d 1395, 1399 (Fed. Cir. 2006). Thus, product designs can never be inherently distinctive and will always require evidence of acquired distinctiveness or secondary meaning. *Wal-Mart Stores, Inc.*, 529 U.S. at 215, 54 USPQ2d at 1069.

When a mark is proposed for registration under Section 2(f) and is approved by the USPTO for publication, as happened with applicant's mark, there is a presumption that the examining attorney found that the applicant had made a prima facie case of acquired distinctiveness.[42] *Yamaha Int'l Corp. v. Hoshino Gakki*

---

functionality." Brief at p. 3. "Count I" of the Notice of Opposition states, however, "[t]he alleged mark of Applicant's Application is a functional configuration of the goods that is not distinctive, has not acquired secondary meaning or acquired distinctiveness, and does not operate as a trademark." Applicant implicitly acknowledges this claim; it asserts in its second affirmative defense with its answer that "[a]pplicant's three-dimensional trademark has acquired distinctiveness through many years of use." Applicant's argument on page 9 of its brief that "the issue of distinctiveness should be limited to functionality" is therefore rejected.

[42] During the prosecution history of this application, the application was subject to an *ex parte* appeal on the issues of functionality and whether the applied-for mark had acquired distinctiveness. At the request of the examining attorney, the Board remanded the case in order to allow the examining attorney to reconsider applicant's evidence of acquired

*Co.*, 840 F.2d 1572, 1576, 6 USPQ2d 1001, 1004 (Fed. Cir. 1988). And, when the same mark is challenged in an *inter partes* proceeding such as this opposition, it is the opposer that has the initial burden to establish prima facie that the applicant did not satisfy the acquired distinctiveness requirement of Section 2(f). *Id.*, 6 USPQ2d at 1005. The opposer may meet this initial burden if it produces "sufficient evidence or argument whereby, on the entire record then before the board, the board could conclude that the applicant has not met its ultimate burden of showing acquired distinctiveness." *Id.* And, as further explained in *Yamaha*, "[i]f the opposer does present its prima facie case challenging the sufficiency of applicant's proof of acquired distinctiveness, the applicant may then find it necessary to present additional evidence and argument to rebut or overcome the opposer's showing and to establish that the mark has acquired distinctiveness." *Id.*; *see also Duramax Marine LLC v. R.W. Fernstrum & Co,* 80 USPQ2d 1780 (TTAB 2006).

Upon review of all of the evidence and arguments in this case, we find that opposer has met its initial burden in challenging the acquired distinctiveness evidence submitted by

---

distinctiveness. The examining attorney "continued and maintained" the functionality refusal and the refusal of the mark as non-distinctive product design in Office actions dated May 18, 2005, August 29, 2006, and May 15, 2007 (the examining attorney made new drawing requirements in each of these Office actions). The application, however, was then approved for publication on December 5, 2007, and the appeal was dismissed without a decision on the merits by the Board.

applicant during the prosecution of its application. That is, based on the entire record, including the patents submitted by opposer and applicant's own statements and catalog highlighting the utilitarian aspects of the applied-for design, there is ample evidence supporting a prima facie showing that consumers will view the pipe boot design as a non-distinctive product design, rather than a design that has acquired distinctiveness and functions as an indicator of the source of the product.

Applicant has not overcome this finding by ultimately establishing that its mark has acquired distinctiveness. Applicant submitted evidence of acquired distinctiveness with its initial application filed on October 18, 2002; said evidence consisted solely of an affidavit of Ronald W. Resech, the president of Portals Plus, Inc., the original applicant in this case. In that affidavit, Mr. Resech made statements regarding the length of use of the product as well as sales and advertising expenditures, and attached examples of advertisements for the pipe boot.

Applicant has not demonstrated with this affidavit that the proposed mark has acquired distinctiveness by at least a preponderance of the evidence. Because the proposed mark is a product design, applicant had to show that the primary significance of the design in the minds of consumers is not that of the product itself, but rather is the source of that pipe

24

boot in order to establish acquired distinctiveness. *See In re Steelbuilding.com*, 415 F.3d 1293, 75 USPQ2d 1420, 1422 (Fed. Cir. 2005); *In re Ennco Display Sys. Inc.*, 56 USPQ2d 1279 (TTAB 2000).

Applicant made a claim in its application of substantially exclusive and continuous use in commerce for the five years prior to the date the statement was made. With respect to applicant's length of use, evidence of substantially exclusive use for number of years may be considered as evidence of acquired distinctiveness. *See* 37 C.F.R. §2.41(b). However, the weight to be accorded this kind of evidence depends on the facts and circumstances of the particular case. *See Yamaha*, 840 F.2d at 1576, 6 USPQ2d at 1004. In this case, when considered in relation to the evidence of record showing the utilitarian nature of applicant's design, the years of use claimed by applicant are insufficient, by themselves or in conjunction with the other evidence of record, to show that the pipe boot design has acquired distinctiveness. *See Mag Instruments Inc. v. Brinkmann Corp.*, 96 USPQ2d 1701, 1723-24 (TTAB 2010) (twenty-seven years of use "simply insufficient" to show distinctiveness either alone or in connection with "substantial sales and advertising").

Applicant also relies on sales and advertising expenditures for the pipe boot. This evidence does little to help establish

25

that the pipe boot design at issue acts as a source-identifier in the minds of consumers. Applicant's sales information only lists the number of units sold and is devoid of any context, such as market share, giving this information little, if any, probative value. Further, the advertising figures applicant provided are not for pipe boots alone, but for advertising expenditures "that <u>include</u> pipe boots." Thus, it is unclear how much advertising applicant devotes to establishing the pipe boot design as a mark in the minds of consumers. *See, e.g.*, *Target Brands Inc. v. Hughes*, 85 USPQ2d 1676, 1681 (TTAB 2007) (advertising expenditures relate to catalogs and advertisements that display numerous goods under a variety of marks). Even if we were to assume that all the advertising expenditures listed by applicant went solely to promoting the pipe boot design as a mark, the amount of advertising is relatively modest per year, considering that it is assumed applicant advertises the pipe boot nationwide. As we have noted before, even a successful advertising campaign is not in itself necessarily enough to prove secondary meaning. *In re Boston Beer Co. L.P.*, 198 F.3d 1370, 53 USPQ2d 1056 (Fed. Cir. 1999) (claim based on annual sales under the mark of approximately eighty-five million dollars, and annual advertising expenditures in excess of ten million dollars, not sufficient to establish acquired distinctiveness in view of highly descriptive nature of mark);

*Braun Inc. v. Dynamics Corp.*, 975 F.2d 815, 827, 24 USPQ2d 1121, 1133 (Fed. Cir. 1992) ("[L]arge consumer demand for Braun's blender does not permit a finding the public necessarily associated the blender design with Braun."); *In re Bongrain Int'l (American) Corp.*, 894 F.2d 1316, 1318, 13 USPQ2d 1727, 1729 (Fed. Cir. 1990) (growth in sales may be indicative of popularity of product itself rather than recognition as denoting origin).

As already discussed, applicant has engaged in advertising that highlights the utilitarian advantages of certain design features of its pipe boot design. However, this does not constitute "look for" advertising because applicant's promotional material does not point consumers to any unique design features of the goods for the purpose of distinguishing the source of its pipe boots from those of competitors. Rather, applicant is merely highlighting the utilitarian features of its pipe boot design. When advertisements are submitted as evidence of acquired distinctiveness, they must demonstrate the promotion and recognition of the specific configuration embodied in the applied-for mark and not of the goods in general. *See, e.g.*, *In re ic! berlin brillen GmbH*, 85 USPQ2d 2021, 2023 (TTAB 2008); *In re Edward Ski Prods. Inc.*, 49 USPQ2d 2001, 2005 (TTAB 1999); *In re Pingel Enter. Inc.*, 46 USPQ2d 1811, 1822 (TTAB 1998). This Board and other courts have emphasized the importance of such

27

advertisements in regard to configuration or product design marks. *See Seabrook Foods, Inc. v. Bar-Well Foods, Ltd.*, 568 F.2d 1342, 1345 n. 8, 196 USPQ 289, 291 n. 8 (C.C.P.A. 1977) (advertising emphasizing design portion of the mark to potential customers is persuasive evidence of acquired distinctiveness); *Mag Instruments Inc.*, 96 USPQ2d at 1723-24 (absence of "look for" advertisements "most damaging" to applicant's claim of acquired distinctiveness); *see also Thomas & Betts Corp. v. Panduit Corp.*, 65 F.3d 654, 662, 36 USPQ2d 1065, 1071-72 (7th Cir. 1995) (advertising "look for the oval head" for cable ties encourages consumers to identify the claimed trade dress with the particular producer); *Duraco Prods. Inc. v. Joy Plastic Enter., Ltd.*, 40 F.3d 1431, 1451, 32 USPQ2d 1724, 1741 (3d Cir. 1994) (advertising expenditures "measured primarily with regard to those advertisements which highlight the supposedly distinctive, identifying feature" of the product configuration); *First Brands Corp. v. Fred Meyer Inc.*, 809 F.2d 1378, 1383, 1 USPQ2d 1779, 1782 (9th Cir. 1987) ("[A]dvertising campaign has not stressed the color and shape of the antifreeze jug so as to support an inference of secondary meaning."). The advertising applicant submitted with its application to support its claim of acquired distinctiveness is deficient because it only shows a picture of the pipe boot and explains where it can be used. *See, e.g., In re Pingel Enter. Inc.*, 46 USPQ2d at 1823

(applicant's catalog and advertising show configuration solely as an illustration of applicant's product and not in a manner that would be understood by consumers as a mark). As for applicant's catalog, the pipe boot does not even appear on the cover. And while certain features of the pipe boot are highlighted inside the catalog, as noted previously, it is their utilitarian purposes or advantages that they provide to consumers that are being touted, which "undermines" a finding of acquired distinctiveness. *See In re Ennco Display Sys. Inc.*, 56 USPQ2d at 1285 (quoting *Thomas & Betts Corp.*, 65 F.3d at 662, 36 USPQ2d at 1071-72). Thus, we do not view applicant's advertising as an attempt to create an association in the minds of consumers between the pipe boot design and applicant as the source of the pipe boot. *See Mag Instrument Inc.,* 96 USPQ2d at 1723-24.

Based upon our consideration of all the evidence in the record, with an emphasis on that specifically discussed above, we find that the pipe boot design has not acquired distinctiveness.

**Decision:** The opposition is sustained on the ground that applicant's proposed mark is functional under Section 2(e)(5) and is not entitled to registration. We further find the mark has not acquired distinctiveness and is not entitled to registration under Section 2(f).